**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**NORTHERN DIVISION**

KYLAN COSTON,

                              CASE NO. 16-10232

        *Plaintiff*,            DISTRICT JUDGE THOMAS L. LUDINGTON

*v.*                         MAGISTRATE JUDGE PATRICIA T. MORRIS

COMMISSIONER OF SOCIAL SECURITY,

        *Defendant*.

_____/

**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON CROSS**
**MOTIONS FOR SUMMARY JUDGMENT (Docs. 14, 16)**

## I.    RECOMMENDATION

    In light of the entire record in this case, I suggest that substantial evidence supports the Commissioner's determination that Coston is not disabled. Accordingly, **IT IS RECOMMENDED** that Coston's Motion for Summary Judgment (Doc. 14) be **DENIED**, that the Commissioner's Motion for Summary Judgment (Doc. 16) be **GRANTED**, and that this case be **AFFIRMED**.

## II.    REPORT

### A.    Introduction and Procedural History

    Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Reference, this case was referred to the undersigned magistrate judge for the purpose of reviewing a final decision by the Commissioner of Social Security ("Commissioner") denying Plaintiff's claim for a period of disability, Supplemental Security Income ("SSI") under Title XVI, 42 U.S.C. § 1381 *et seq.*, and Disability Insurance Benefits ("DIB") under

Title II of the Social Security Act 42 U.S.C. § 401 *et seq.* (Doc. 4; Tr. 1-4). The matter is currently before the Court on cross-motions for summary judgment. (Docs. 14, 16).

Plaintiff Kylan Coston was forty-one years old as of June 19, 2015, the date of the ALJ's decision. (Tr. 21, 182). His application for benefits was initially denied on November 26, 2013. (Tr. 122-41). Coston requested a hearing before an Administrative Law Judge ("ALJ"), which took place before ALJ Anthony Smereka on April 21, 2015. (Tr. 26-65). Coston, represented by attorney Elizabeth Blount, testified, as did vocational expert ("VE") Anne Holder. (*Id.*). On June 19, 2015, the ALJ issued a written decision in which he found Coston not disabled. (Tr. 12-21). On November 25, 2015, the Appeals Council denied review. (Tr. 1-4). Coston filed for judicial review of that final decision on February 16, 2016. (Doc. 1).

### B.      Standard of Review

The district court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). The district court's review is restricted solely to determining whether the "Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Sullivan v. Comm'r of Soc. Sec.*, 595 F. App'x 502, 506 (6th Cir. 2014) (internal citations omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotations omitted).

The Court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *See Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6th Cir. 1989). The Court will not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Id*. at 286 (internal citations omitted).

### C.    Framework for Disability Determinations

Under the Act, "DIB and SSI are available only for those who have a 'disability.'" *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability

> to engage in any substantial gainful activity by reason of any
> medically determinable physical or mental impairment which
> can be expected to result in death or which has lasted or can be
> expected to last for a continuous period of not less than [twelve]
> months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI). The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial
> gainful activity, benefits are denied without further analysis.

3

Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education or work experience.

Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five:  Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

20 C.F.R. §§ 404.1520, 416.920. *See also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his or] her impairments and the fact that she is precluded from performing [his or] her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her RFC [residual functional capacity] and

considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

Under the authority of the Social Security Act, the SSA has promulgated regulations that provide for the payment of disabled child's insurance benefits if the claimant is at least 18 years old and has a disability that began before age 22 (20 C.F.R. 404.350(a) (5) (2013). A claimant must establish a medically determinable physical or mental impairment (expected to last at least twelve months or result in death) that rendered her unable to engage in substantial gainful activity. 42 U.S.C. § 423(d)(1)(A). The regulations provide a five-step sequential evaluation for evaluating disability claims. 20 C.F.R. § 404.1520.

### D.    ALJ Findings

Following the five-step sequential analysis, the ALJ found Coston not disabled under the Act. (Tr. 21). The ALJ found at Step One that Coston had not engaged in substantial gainful activity following the alleged onset date, April 23, 2012. (Tr. 14). At Step Two, the ALJ concluded that Coston had the following severe impairments: "seizure disorder and depression with anxiety." (*Id.*). At Step Three, the ALJ found that Coston's combination of impairments did not meet or equal one of the listed impairments. (Tr. 15-16). The ALJ then found that Coston had the residual functional capacity ("RFC") to perform work at all exertional levels, except with nonexertional limitations as follows:

> Simple, unskilled work involving no exposure to heights or dangerous moving machinery or other hazards; no climbing of any ladders, ropes, or scaffolds; no exposure to sharp or hot objects; no loud noises, defined as no more than light industrial settings; no driving in the course of employment;

5

no contact with the public; no exposure to bright or flashing lights; no more than occasional contact with coworkers and supervisors; and no fast production pace work where the pace is set by others.

(Tr. 16-19). At Step Four, the ALJ found that Coston could not return to any past relevant work. (Tr. 19). At Step Five, the ALJ concluded that Coston retained the ability to perform work which exists in significant numbers in the national economy. (Tr. 20).

### E.     Administrative Record

#### 1.     Medical Evidence

The Court has thoroughly reviewed Coston's medical record. In lieu of summarizing his medical history here, the Court will make references and provide citations to the record as necessary in its discussion of the parties' arguments.

#### 2.     Application Reports and Administrative Hearing

##### a.     Coston's Function Report

Coston completed a function report on August 26, 2013, in which he asserted that his seizures render him incapacitated, and that he suffers from "up and down mood swings" and "headaches throughout the day." (Tr. 236). He spent his days in his room "all day watching tv and sleep[ing]." (Tr. 237). He suffered seizures during sleep which interrupted his rest. (*Id*.). His seizures were sometimes triggered by sounds, including the sound of a toilet flushing. (*Id*.). He required reminders to take medicine. (Tr. 238). He never prepared meals, and performed no house or yard work, but (inexplicably) required help or encouragement to not perform these chores. (*Id*.). He did not perform such tasks for fear

6

that he would pass out. (Tr. 239). He traveled outdoors "once in a while," but did not like going outside for fear that others were judging him. (*Id*.). He could not go out alone, and was told by his physicians not to drive. (*Id*.). He performed no shopping. (*Id*.). He sometimes forgot to pay his bills. (*Id*.). Coston averred that he did not "handle money" because he did not "want to pass out and wake up and all my money is gone." (Tr. 240). His hobbies included watching television "all day." (*Id*.). He experienced mood swings which caused him to avoid others. (Tr. 241). Coston checked a box indicating that he experiences lifting limitations, and noted that his physicians warned him against lifting "anything." (*Id*.). He also checked a box indicating that his memory was limited, but did not check boxes indicating limitations in terms of concentrating, completing tasks, understanding, following instructions, or getting along with others. (*Id*.). He could walk about a mile and pay attention for five to ten minutes. (*Id*.). He had difficulty following instructions or directions. (*Id*.). He did not get along well with authority figures and was fired from one job due to stress problems. (Tr. 242). He checked the locks on his doors repeatedly and without justification. (*Id*.). His use of medication caused dizziness, drowsiness, and agitation. (Tr. 243).

### b.    Third-Party Function Report

On August 26, 2013, Coston's fiancée Nisa Miller filled out a third-party function report which generally corroborated Coston's own function report. (Tr. 224-31).

### c.      Coston's Testimony at the Administrative Hearing

At the April 21, 2015, hearing before the ALJ, Coston testified that he was a high school graduate and completed two years of college. (Tr. 30). The ALJ asked questions regarding Coston's past work, though this testimony is irrelevant because the ALJ concluded that Coston could not perform any past relevant work. (Tr. 20, 31-36). Coston asserted that his seizures ranged from grand mal[1], involving loss of consciousness and which caused him to sleep for "several days," to petit mal[2], which caused mental absence. (Tr. 38-39). The grand mal seizures occurred roughly "two times a month or within a six-week period." (*Id.*). He experienced petit mal seizures "three [times] in one day, five in one day, every month that that goes on." (*Id.*). He took Topamax for treatment of seizures, but found only partial relief. (Tr. 39-40). He also experienced severe headaches "daily." (Tr. 40). Coston admitted that he experienced no difficulty walking, standing, or sitting, but asserted that his seizures sometimes imposed limitations on those abilities. (Tr. 40-41). His doctor told him to not "lift anything," and to not drive. (Tr. 41). He testified that medication side effects included depression, irritability, somnolence, and desire to not leave the home. (Tr. 42). His sleep was sometimes interrupted by seizures, and he napped regularly during the day for "an hour or two." (Tr. 42-43). He performed no household chores, and

---

[1] Grand mal seizures are also referred to in the record as "generalized tonic-clonic" seizures. (Tr. 465). Listing 11.02 refers to grand mal seizure as "major motor seizures." For the sake of simplicity, the undersigned will use the term "grand mal."

[2] Petit mal seizures are also referred to in the medical record as complex partial seizures. (Tr. 464). Listing 11.03 refers to petit mal seizures as "minor motor seizures." For the sake of simplicity, the undersigned will use the term "petit mal."

sometimes went without changing his clothes. (Tr. 44). He experienced crying spells weekly, and sometimes experienced visual hallucinations. (Tr. 45). Coston had significant issues concentrating, did not "like other people," and engaged in no social activity. (Tr. 45-46).

Coston testified that his seizures began in 2000; when asked why he could work through 2008 but could no longer work, he responded that the seizures were now more severe, and "rougher." (Tr. 46). He no longer enjoyed being around others, and felt embarrassed when experiencing seizures around co-workers. (*Id*.). When asked how he spent his days, Coston asserted that he watched television or visited his mother. (Tr. 47). When asked why a physician imposed a restriction of lifting no weight, Coston asserted that he assumed the restriction was related to his tendency to seize and pass out. (*Id*.).

Regarding medication non-compliance, Coston asserted that he took his medication as directed; he further claimed that three failures to take medication in the past several years were due to lack of insurance. (Tr. 50). Coston's attorney noted that he failed to take the seizure medication Vimpat due to lack of funds, but continued taking his "primary" seizure medication Keppra. (Tr. 52).

### d.    The VE's Testimony at the Administrative Hearing

The ALJ then called upon the services of a VE to determine Coston's ability to perform work. (Tr. 53). The ALJ asked several questions regarding Coston's past work, but these questions are not relevant as the ALJ found that Coston was unable to perform

9

any past work, and thus based his unfavorable decision on Coston's ability to complete other work available in the national economy. (Tr. 53-55).

The ALJ asked the VE to assume a hypothetical individual with Coston's age, education, and work experience, and who could perform work at all exertional levels, but with a limitation to "simple, unskilled work involving no exposure to heights or moving machinery; no contact with the public; and no exposure to bright or flashing lights." (Tr. 56). The VE found that such a worker could perform work available in the national economy, including the positions of packer (105,000 jobs nationally), and inspector (200,000 nationally). (Tr. 56).

The ALJ then posed a second hypothetical, wherein the worker would be limited as in the first hypothetical, but with additional limitations to "no hazards, including work at unprotected heights or around dangerous moving machinery; and no climbing or any ladders, ropes, or scaffolds; and no exposure to sharp or hot objects; no driving in the course of employment; no fast production pace work where the pace is set by others," and no work involving loud industrial noises. (Tr. 57). The VE found that a so-limited individual would be able to perform work as an inspector (as described above), bench assembler (250,000 jobs), or sorter (84,000 jobs). (Tr. 58).

In a third hypothetical, the ALJ added that the worker would be limited to "no more than occasional contact with coworkers or supervisors." (Tr. 58). The VE found that such a worker could perform those jobs identified in the prior hypothetical. (*Id*.).

10

The VE confirmed that an employee who missed two days "every other month" would be precluded from competitive employment. (Tr. 59). The VE also asserted that she had seen employers fire employees due to a seizure disorder. (Tr. 59-60). The VE also found that an employee who experienced regular seizures might be fired due to absenteeism because an incident of seizure in the workplace would likely result in the worker being taken to the hospital by ambulance, followed by two or three days of missed work. (Tr. 61). The ALJ noted that some maladies result in work limitations beyond those readily perceived by the Social Security regulations, and particularly referenced the panic regarding the HIV virus during the early years of that disease, which practically prevented HIV sufferers from obtaining work even if they could perform the tasks demanded. (Tr. 62). The ALJ further asserted that he would consider the practical limitations imposed by seizures, including whether they would result in absenteeism which would preclude work, as suggested by the VE. (Tr. 62). Finally, the ALJ noted that he was bound by Social Security regulations, and opined that a "judge . . . upstairs" including a "federal magistrate or anything," might be able to offer relief even if the ALJ could not. (Tr. 62-63).

### F.    Governing Law

In the Sixth Circuit, a prior decision by the Commissioner can preclude relitigation in subsequent cases.

> When adjudicating a subsequent disability claim with an unadjudicated period arising under the same title of the Act as the prior claim, adjudicators must adopt such a finding from the final decision by an ALJ or the Appeals Council on the prior claim in determining whether the claimant is disabled

> with respect to the unadjudicated period unless there is new and material evidence relating to such a finding or there has been a change in the law, regulations or rulings affecting the finding or the method for arriving at the finding.

SSR 98-4(6), 1998 WL 283902, at *3 (acquiescing to *Drummond v. Commissioner*, 126 F.3d 837 (6th Cir. 1997)). The regulations also explicitly invoke *res judicata*: An ALJ can dismiss a hearing where "res judicata applied in that we have a previous [final] determination or decision under this subpart about your rights." 20 C.F.R. §§ 404.957, 416.1457. Collateral estoppel is the branch of *res judicata* applied in this context. As the Third Circuit explained, *res judicata* formally "consists of two preclusion concepts: issue preclusion and claim preclusion." *Purter v. Heckler*, 771 F.2d 682, 689 n.5 (3d Cir. 1985); *see also Groves v. Apfel*, 148 F.3d 809, 810 (7th Cir. 1998) (discussing the "collateral estoppel branch of res judicata" in social security cases). Claim preclusion prevents renewing a judgment on the same cause of action; issue preclusion, or collateral estoppel is less expansive: "foreclosing relitigation on all matters that were actually and necessarily determined in a prior suit." *Purter*, 771 F.2d at 689 n.5.

The *res judicata* effect of past ALJ decisions is actually a form of collateral estoppel precluding reconsideration of discrete factual findings and issues. *See Brewster v. Barnhart*, 145 F. App'x 542, 546 (6th Cir. 2005) ("This Court will apply collateral estoppel to preclude reconsideration by a subsequent ALJ of factual findings that have already been decided by a prior ALJ when there are no changed circumstances requiring review."). The Commissioner's internal guide explains the different issues and factual findings precluded

12

by *res judicata* under *Drummond*. *See Soc. Sec. Admin., Hearings, Appeals, and Litigation Law Manual*, § I-5-4-62, 1999 WL 33615029, at *8-9 (Dec. 30, 1999). These include the RFC and various other findings along the sequential evaluation process, such as "whether a claimant's work activity constitutes substantial gainful activity," whether she has a severe impairment or combination of impairments, or whether she meets or equals a listing. *Id.*

Evidence of "changed circumstances" after the prior decision allows the ALJ to make new findings concerning the unadjudicated period without disturbing the earlier decision. *See Bailey ex rel. Bailey v. Astrue*, No, 10-262, 2011 WL 4478943, at *3 (E.D. Ky. Sept. 26, 2011) (citing *Drummond*, 126 F.3d at 842-43). In other words, even though the first ALJ did not make any findings concerning the latter period, her decision still applies to that period absent the requisite proof. Thus, as applied in this Circuit, the SSR 98-4(6) and *Drummond* essentially create a presumption that the facts found in a prior ruling remain true in a subsequent unadjudicated period unless "there is new and material evidence" on the finding. *See Makinson v. Colvin*, No. 5: 12CV2643, 2013 WL 4012773, at *5 (N.D. Ohio Aug. 6, 2013) (adopting Report & Recommendation) ("[U]nder *Drummond* and AR 98-4(6), a change in the period of disability alleged does not preclude the application of *res judicata*.") (citing *Slick v. Comm'r of Soc. Sec.*, No. 07-13521, 2009 U.S. Dist. LEXIS 3653, 2009 WL 136890, at *4 (E.D. Mich. Jan. 16, 2009); *cf. Randolph v. Astrue*, 291 F. App'x 979, 981 (11th Cir. 2008) (characterizing the Sixth Circuit's rule as creating a presumption); *Chavez v. Bowen*, 844 F.2d 691, 693 (9th Cir. 1988) ("The

13

claimant, in order to overcome the presumption of continuing nondisability arising from the first administrative law judge's findings of nondisability, must prove 'changed circumstances' indicating a greater disability." (quoting *Taylor v. Heckler*, 765 F.2d 872, 875 (9th Cir. 1985))).

In *Drummond*, for example, the court held that the first ALJ's RFC applied to a subsequent period unless the circumstances had changed. 126 F.3d at 843; *see also Priest v. Soc. Sec. Admin.*, 3 F. App'x 275, 276 (6th Cir. 2001) (noting that in order to win benefits for a period after a previous denial, the claimant "must demonstrate that her condition has so worsened in comparison to her condition [as of the previous denial] that she was unable to perform substantial gainful activity"); *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1232-33 (6th Cir. 1993) (same). The Sixth Circuit made this clear in *Haun v. Commissioner of Social Security*, rejecting the argument that *Drummond* allowed a second ALJ to examine *de novo* the unadjudicated period following the first denial. 107 F. App'x 462, 464 (6th Cir. 2004).

To overcome the presumption that the claimant remains able to work in a subsequent period, the claimant must proffer new and material evidence that her health declined. The Sixth Circuit has consistently anchored the analysis on the comparison between "circumstances existing at the time of the prior decision and circumstances existing at the time of the review." *Kennedy v. Astrue*, 247 F. App'x 761, 768 (6th Cir. 2007). In a case predating *Drummond*, the court explained. "[W]hen a plaintiff previously has been

14

adjudicated not disabled, she must show that her condition so worsened in comparison to her earlier condition that she was unable to perform substantial gainful activity." *Casey*, 987 F.2d at 1232-33. Later, it reiterated, "In order to be awarded benefits for her condition since [the previous denial], Priest must demonstrate that her condition has . . . worsened in comparison to her [previous] condition . . . ." *Priest*, 3 F. App'x at 276. The ALJ must scan the medical evidence "with an eye toward finding some change from the previous ALJ decision . . . ." *Blackburn v. Comm'r of Soc. Sec.*, No. 4:1-cv-58, 2012 WL 6764068, at *5 (E.D. Tenn. Nov. 14, 2012), *Report & Recommendation adopted by* 2013 WL 53980, at *1 (Jan. 2, 2013). That is, the evidence must not only be new and material, but also must show deterioration. *Drogowski v. Comm'r of Soc. Sec.*, No. 10-12080, 2011 U.S. Dist. LEXIS 115925, 2011 WL 4502988, at *8 (E.D. Mich. July 12, 2011), *Report & Recommendation adopted by* 2011 U.S. Dist. LEXIS 110609, 2011 WL 4502955, at *4 (Sept. 28, 2011). In *Drogowski*, for example, the court rejected the plaintiff's argument that a report met this test simply because it was not before the first ALJ. *See* 2011 WL 4502988 at *2, 8-9. These decisions make clear that the relevant change in circumstances is not a change in the availability of evidence but a change in Plaintiff's condition.

The Court notes that Coston previously applied for benefits and was denied. (Tr. 183, 180-92). The ALJ in this case found that he was bound to accept the prior decision unless new and material evidence was presented; finding such evidence, ALJ Kramzyk did not adopt the findings of that prior decision. (Tr. 113). Neither party argues that the ALJ

erred in refusing to adopt the prior ALJ's decision, thus this Court need not further analyze that decision.

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B). The regulations carve the evidence into various categories, "acceptable medical sources" and "other sources." 20 C.F.R. § 404.1513. "Acceptable medical sources" include, among others, licensed physicians and licensed or certified psychologists. *Id.* § 404.1513(a). "Other sources" include medical sources who are not "acceptable" and almost any other individual able to provide relevant evidence. *Id.* § 404.1513(d). Only "acceptable medical sources" can establish the existence of an impairment. SSR 06-03p, 2006 WL 2329939, at *2. Both "acceptable" and non-acceptable sources provide evidence to the Commissioner, often in the form of opinions "about the nature and severity of an individual's impairment(s), including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions." *Id.* at *2. When "acceptable medical sources" issue such opinions, the regulations deem the statements to be "medical opinions" subject to a multi-factor test that weighs their value. 20 C.F.R. § 404.1527. Excluded from the definition of "medical opinions" are various decisions reserved to the Commissioner, such as whether the claimant meets the statutory definition of disability and how to measure his or her RFC. *Id.* at 404.1527(d).

The ALJ must use a six-factor balancing test to determine the probative value of medical opinions from acceptable sources. 20 C.F.R. § 404.1527(c). The test looks at whether the source examined the claimant, "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). *See also* 20 C.F.R. § 404.1527(c). ALJs must also apply those factors to "other source" opinions. *See Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 540-42 (6th Cir. 2007); SSR 06-3p, 2006 WL 2329939, at *2.

Certain opinions of a treating physician, in contrast, receive controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and are "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2). *See also Wilson*, 378 F.3d at 544. The only opinions entitled to dispositive effect deal with the nature and severity of the claimant's impairments. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2. Therefore, the ALJ does not owe a treating opinion deference on matters reserved to the Commissioner. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2. The ALJ "will not give any special significance to the source of an opinion" regarding whether a person is disabled or unable to work, whether an impairment meets or equals a Listing, the individual's RFC, and the application of vocational factors. 20 C.F.R. § 404.1527(d)(3).

17

The regulations mandate that the ALJ provide "good reasons" for the weight assigned to the treating source's opinion in the written determination. 20 C.F.R. § 404.1527(c)(2). *See also Coston v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007). Therefore, a decision denying benefits

> must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's opinion and the reasons for that weight.

SSR 96-2p, 1996 WL 374188, at *5 (1996). *See also Rogers*, 486 F.3d at 242. For example, an ALJ may properly reject a treating source opinion if it lacks supporting objective evidence. *Revels v. Sec. of Health & Human Servs*, 882 F. Supp. 637, 640-41 (E.D. Mich. 1994), *aff'd*, 51 F.3d 273, 1995 WL 138930, at *1 (6th Cir. 1995) (unpublished table decision).

An ALJ must analyze the credibility of the claimant, considering the claimant's statements about pain or other symptoms with the rest of the relevant evidence in the record and factors outlined in Social Security Ruling 96-7p. Credibility determinations regarding a claimant's subjective complaints rest with the ALJ. *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987). Generally, an ALJ's credibility assessment can be disturbed only for a "compelling reason." *Sims v. Comm'r of Soc. Sec.*, No. 09-5773, 2011 WL 180789, at *4 (6th Cir. Jan. 19, 2011) (citing *Coston v. Halter*, 307

F.3d 377, 379 (6th Cir. 2001)); *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004).

The Social Security regulations establish a two-step process for evaluating subjective symptoms, including pain. 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2. The ALJ evaluates complaints of disabling pain by confirming that objective medical evidence of the underlying condition exists. The ALJ then determines whether that condition could reasonably be expected to produce the alleged pain or whether other objective evidence verifies the severity of the pain. *See* 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2; *Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 117 (6th Cir. 1994). The ALJ ascertains the extent of the work-related limitations by determining the intensity, persistence, and limiting effects of the claimant's symptoms. SSR 96-7p, 1996 WL 374186, at *2.

While "objective evidence of the pain itself" is not required, *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986) (quotation omitted), a claimant's description of his or her physical or mental impairments alone is "not enough to establish the existence of a physical or mental impairment," 20 C.F.R. § 404.1528(a). Nonetheless, the ALJ may not disregard the claimant's subjective complaints about the severity and persistence of the pain simply because they lack substantiating objective evidence. SSR 96-7p, 1996 WL 374186, at *1. Instead, the absence of objective confirming evidence forces the ALJ to consider the following factors:

    (i)    [D]aily activities;

    (ii)   The location, duration, frequency, and intensity of . . . pain;

    (iii)  Precipitating and aggravating factors;

    (iv)  The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;

    (v)   Treatment, other than medication, . . . received for relief of . . . pain;

    (vi)  Any measures . . . used to relieve . . . pain.

20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3). *See also Felisky v. Bowen*, 35 F.3d 1027, 1039-40 (6th Cir. 1994); SSR 96-7p, 1996 WL 374186, at *3. Furthermore, the claimant's work history and the consistency of his or her subjective statements are also relevant. 20 C.F.R. § 404.1527(c); SSR 96-7p, 1996 WL 374186, at *5.

       The claimant must provide evidence establishing her RFC. The statute lays the groundwork for this, stating, "An individual shall not be considered to be under a disability unless he [or she] furnishes such medical and other evidence of the existence thereof as the Secretary may require." 42 U.S.C. § 423(d)(5)(A). *See also Bowen*, 482 U.S. at 146 n.5. The RFC "is the most he [or she] can still do despite his [or her] limitations," and is measured using "all the relevant evidence in [the] case record." 20 C.F.R. § 404.1545(a)(2). A hypothetical question to the VE is valid if it includes all credible limitations developed prior to Step Five. *Casey v. Sec. of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993); *Donald v. Comm'r of Soc. Sec.*, No. 08-14784-BC, 2009 WL 4730453, at *7 (E.D. Mich. Dec. 9, 2009).

## G.    Analysis

Coston argues in his admirably succinct brief that the ALJ erred in a single manner: failing to conclude that Coston met or equaled Listings 11.02 and 11.03, both of which relate to seizure disorders. (Doc. 14 at 10-12).

### 1.    The ALJ Properly Analyzed Listings 11.02 and 11.03

Coston asserts that the ALJ did not properly evaluate whether he met or equaled Listings 11.02 and 11.03. (Doc. 14 at 10). A claimant is disabled under Listing 11.02 where he or she exhibits:

> Major motor seizures (grand mal or psychomotor), documented by EEG and by detailed description of a typical seizure pattern, including all associated phenomena; occurring more frequently than once a month, in spite of at least 3 months of prescribed treatment. With
> A. Daytime episodes (loss of consciousness and convulsive seizures) Or
> B. Nocturnal episodes manifesting residuals which interfere significantly with activity during the day.

20 C.F.R. § Pt. 404, Subpt. P, App. 1, § 11.02. Disability is found under Listing 11.03 where the claimant demonstrates the following:

> Minor motor seizures (petit mal, psychomotor, or focal, documented by EEG and by detailed description of a typical seizure pattern, including all associated phenomena; occurring more frequently than once weekly in spite of at least 3 months of prescribed treatment. With alteration of awareness or loss of consciousness and transient postictal manifestations of unconventional behavior or significant interference with activity during the day.

*Id*. § 11.03.

21

Coston asserts that the ALJ "never evaluated the medical evidence," and instead relies upon "conclusory statements that the claimant does not meet the listing." (Doc. 13 at 11). He specifically notes Dr. Neepti Zutshi's May 2015 medical source statement providing that "Plaintiff suffers 1-2 seizures and 3-5 starring spells; both convulsive and non-convulsive seizures; includes loss of consciousness; experiences confusion, irritability, and difficulties communicating; rest is needed after seizures; stress causes seizure onset; and would miss approximately three days per month related to his seizures. (*Id.*, Tr. 545-47). Coston also notes that the ALJ found that he did not consistently take medication, but did not consider whether Coston's inconsistent treatment was the result of poverty; Coston points to several locations in the record where it was found that his non-compliance was due to a lack of funds. (*Id.*). Coston also recites the relevant portions of the medical record as follows:

> The medical records indicate since the onset date the Plaintiff has had regular and continuing seizures both convulsive and non-convulsive. Plaintiff was noted to have "back to back" seizures in January 2012; noted to have 5 seizures between July 2012 through December 2012; in December 2013 Plaintiff was noted to have seizures 2-3 times per month; in March of 2014 Plaintiff was noted to have 2 "complex partial seizures since last visit" in January 2014, and noted to have increasing seizures; in November 2014 Plaintiff noted several back to back seizures; in February 2015, Plaintiff was noted to have continuing seizures that were increasing in severity; In April 2015, Plaintiff was noted to have 3 seizures in the previous 8 weeks.

(Doc. 13 at 12).

22

### a.    Coston Does Not Meet or Equal Listing 11.02

As reproduced above, Listing 11.02 addresses the disabling effect of grand mal seizures. While that listing provides numerous conditions which must be met, the most relevant in this case is that the grand mal seizures must occur "more frequently than once a month, in spite of at least 3 months of prescribed treatment." 20 C.F.R. § Pt. 404, Subpt. P, App. 1, § 11.02. This ambiguous language does not resolve whether the petitioner must demonstrate more than one grand mal seizure per month *following* three months of treatment, or more than one grand mal seizure *during* three months of treatment. The Commissioner appears to have recognized this ambiguity, and promulgated an updated listing which directly addresses the amount of time under consideration. The prior version of Listing 11.02 ("grand mal prior version" or "GMPV"), as reproduced above, expired on September 28, 2016. *See* Social Security Administration Programs Operations Manual System 11.00 Neurological Listings from 12/15/04 to 09/28/16, https://secure.ssa.gov/poms.nsf/lnx/0434131013, last visited January 13, 2017. The updated version of Listing 11.02 ("grand mal updated version" or "GMUV") took effect on September 29, 2016. *See* 20 C.F.R. § Pt. 404, Subpt. P, App. 1. The GMUV provides, in relevant part, that a claimant is disabled by grand mal seizures when they suffer from:

> Epilepsy, documented by a detailed description of a typical seizure and characterized by A . . . .

23

> A. Generalized tonic-clonic seizures[3] . . . occurring at least once a month for at least 3 consecutive months . . . despite adherence to prescribed treatment . . . .

*Id.* In addition to clarifying that the seizures must occur over a period of three months, the GMUV also lowers the claimant's burden, reducing the necessary amount of seizures from more than one per month (*i.e.* at least two per month) to one per month.

The ALJ's decision in this case was rendered in mid-2015, and thus was subject to the GMPV, not the GMUV. However, the GMUV may provide some guidance when interpreting the GMPV. One potential reading of the GMPV would provide that grand mal seizures must occur more than once per month during a three month span; the GMUV seems to confirm that interpretation. I therefore find that the GMPV, which applies in this case, should be read to require that Coston experienced two or more seizures per month over a span of three months. Most courts which have had occasion to interpret the GMPV have simply not addressed whether the claimant must experience more than one grand mal seizure per month for any particular number of months. *See, e.g.*, *Anthony v. Astrue*, 266 F. App'x 451, 458 (6th Cir. 2008); *Willette v. Comm'r of Soc. Sec.*, No. 14-11637, 2015 WL 5559833, at *3 (E.D. Mich. Aug. 24, 2015), report and recommendation adopted, No. 14-11637, 2015 WL 5545718 (E.D. Mich. Sept. 18, 2015); *Mughni v. Astrue*, No. 1:11-CV-18, 2011 WL 6307831, at *11 (S.D. Ohio Nov. 16, 2011), report and recommendation

---

[3] "A grand mal seizure—also known as a tonic-clonic seizure—features a loss of consciousness and violent muscle contractions. It's the type of seizure most people picture when they think about seizures in general." See http://www.mayoclinic.com/health/grand-mal-seizure/DS00222 (last visited January 13, 2017).

adopted, No. 1:11-CV-18, 2011 WL 6415368 (S.D. Ohio Dec. 13, 2011). The undersigned was able to locate only one court which attempted to fix a particular length of time to the GMPV: the court in *Duncan v. Colvin*, No. 2:15-CV-02013-MEF, 2015 WL 9238961, at *3 (W.D. Ark. Dec. 17, 2015) concluded that "Listing 11.02 requires documentation of a three-month history wherein the Plaintiff was on medication but experienced more than one grand mal or psychomotor seizure per month." Interpreting the GMPV consistent with the GMUV is therefore also supported by the available case law.

I now turn to Coston's medical record. Coston makes no effort to identify seizures which could support a finding of disability prior to his alleged onset date (Doc. 13 at 12), and has thus abandoned and waived any argument which could support a finding of disability prior to the alleged onset date; the Court therefore need not discuss records predating April 2012.

In April 2012 Coston reported "'daily auras,'" though no discussion of his seizure frequency was provided. (Tr. 420). Coston reported experiencing a grand mal seizure in July 2012. (Tr. 487). In December 2012 Coston reported experiencing "5 total seizures since he was last seen in July 2012," of which two were "generalized convulsions." (Tr. 294). He experienced generalized convulsions in July 2012 (Tr. 487), and September and November of 2012. (Tr. 484).

In March 2013 Coston reported experiencing an unspecified variety of seizure one week prior. (Tr. 320). In November 2013 Coston was "[s]till having 1-2 seizures / month."

25

(Tr. 354). In December 2013 he reported experiencing "seizures 2-3 times per month." (Tr. 480).

In March 2014 Coston stated that his last grand mal seizure was four months prior. (Tr. 473). In July 2014 Coston reported not experiencing a grand mal seizure in approximately seven months. (Tr. 468). Epilepsy monitoring revealed no "typical events and did not show any abnormality." (Tr. 470). In November 2014 Coston stated that he "ha[d] not had any generalized tonic-clonic [*i.e.* grand mal] seizures in the past 10 months." (Tr. 465).

In February 2015 Coston stated that his last seizure, of an unstated variety, was six weeks prior. (Tr. 527). It was noted at that time that he was not taking medication because of an insurance mix-up. (Tr. 530). In February 2015 Coston experienced symptoms which could be characterized as a grand mal seizure, including "'black[ing] out.'" (Tr. 460). It was noted that Coston was not taking the anti-seizure medication Vimpat because he could not afford it. (Tr. 462).

Again, Listing 11.02 requires grand mal seizures occurring "more frequently than once a month" during a three month period, along with the subpart A and B criteria. The Commissioner focuses on Coston's lack of consistent treatment as disqualifying him from meeting that listing, and Coston argues in response that he could not always afford or obtain his medication. Yet regardless of treatment, Coston cannot meet Listing 11.02 because he did not experience grand mal seizures on a sufficiently regular basis. Coston does not

26

appear to have suffered more than one grand mal seizure in any given month during his treatment period. Even assuming, in the absence of evidence, that Coston's undifferentiated "seizures" in March, November, and December of 2013 were all of the grand mal variety, he has not alleged that he experience more than one grand mal seizure per month during any three month period. Coston thus could not qualify for Listing 11.02 even if he was properly and consistently following seizure treatment. That Coston suffered so few grand mal seizures despite the lack of consistent treatment amply demonstrates that he was not disabled by grand mal seizures.

### b.    Coston Does Not Meet or Equal Listing 11.03

As to petit mal seizures, Listing 11.03 requires that the claimant suffer from seizures "more frequently than once weekly in spite of at least 3 months of prescribed treatment," and requires that the claimant also exhibit "alteration of awareness or loss of consciousness and transient postictal manifestations of unconventional behavior or significant interference with activity during the day." 20 C.F.R. § Pt. 404, Subpt. P, App. 1, § 11.03. This listing, as with Listing 11.02, is susceptible to multiple interpretations, because it does not provide whether the seizures must occur following three months of treatment, or during three months of treatment. The Commissioner again appears to have recognized this lack of clarity, and promulgated an updated listing which specifies the amount of time under consideration. The prior version of Listing 11.03 ("petit mal prior version" or ("PMPV"), as reproduced above, expired on September 28, 2016. *See* Social Security Administration

27

Programs Operations Manual System 11.00 Neurological Listings from 12/15/04 to 09/28/16, https://secure.ssa.gov/poms.nsf/lnx/0434131013, last visited January 13, 2017. The updated version of Listing 11.03 ("petit mal updated version" or "PMUV") has been merged into Listing 11.02, and is now referred to as Listing 11.02(B).[4] *See* Social Security Administration Programs Operations Manual System 11.00 Neurological Listings, https://secure.ssa.gov/poms.nsf/lnx/0434001030, last visited January 13, 2017. The updated version provides, in relevant part, that a claimant is disabled by petit mal seizures when they suffer from:

> Epilepsy, documented by a detailed description of a typical seizure and characterized by . . . B . . . .
>
> B. Dyscognitive seizures . . . occurring at least once a week for at least 3 consecutive months . . . despite adherence to prescribed treatment . . . .

*Id.* The PMUV lowers the bar for claimants seeking disability based on non-convulsive epileptic seizures, requiring only one seizure per week rather than two. More importantly, it also specifies that the claimant must show that these seizures occur over a span of three consecutive months. As with the GMPV and GMUV, I find that PMPV should be interpreted in a manner consistent with the PMUV, and consistent with the case law.

---

[4] The PMPV refers to "non-convulsive epilepsy (petit mal, psychomotor, or focal)," whereas the PMUV refers to "dyscognitive seizures," which "are characterized by alteration of consciousness without convulsions or loss of muscle control." The PMUV now excludes "psychogenic nonepileptic seizures or pseudoseizures," which are now considered under Listing 12.00 (covering generalized mental disorders), rather than 11.00 (neurological disorders). It suffices to say for the purposes of this case that Coston's non-convulsive seizures are generally described as of the petit mal variety (*see, e.g.*, 480, 510, 549), and would thus be covered by the PMPV and PMUV, rather than the updated version of Listing 12.00. I therefore refer to the PMUV for assistance in interpreting the PMPV.

28

Therefore, to demonstrate disability under the PMPV, Coston must thus show that he experienced two or more petit mal seizures per week for three consecutive months.

I now turn to Coston's medical records regarding petit mal seizures: in late 2012 Coston described experiencing two to three petit mal seizures per month. (Tr. 487). In December 2013 he reported two to three undifferentiated variety of seizures per month, and experienced five petit mal seizures within two days. (Tr. 480). In January 2014 he reported an unstated number of petit mal seizures. (Tr. 476). In March 2014 he reported experiencing two petit mal seizures since his last visit. (Tr. 472). In June 2014 he reported that his last petit mal seizure occurred six weeks prior (Tr. 510), and the physician noted that his petit mal seizures occurred "about once a month" (Tr. 512). He experienced "two back to back" petit mal seizures while under observation in June 2014. (Tr. 506-07). In November 2014 he experienced three breakthrough petit mal seizures which "recurred" within a span of thirty minutes, though he did not specify when these seizures occurred. (Tr. 464). The undersigned found no further discussion of petit mal seizures until February 2015, when Dr. Zutshi asserted that Coston experienced three to five petit mal seizures per month. (Tr. 549).

Coston therefore did not experience two or more petit mal seizures per week during any given month during his treatment history, much less for three consecutive months. While in Dr. Zutshi's estimation Coston experienced three to five petit mal seizures per month, this assessment is insufficient to demonstrate that Coston meets the PMPV. First,

even if Coston experienced either three or four seizures monthly, spaced by intervals of a week, he would not meet the requirements of the PMPV. Second, even if Coston experienced five seizures per month, Dr. Zutshi's assessment does not establish whether at least one of those seizures occurred in each week of the month. Third, there is no evidence that Coston experienced such seizures for three consecutive months. Fourth, and most importantly, the medical record simply does not support Dr. Zutshi's assessment. The highest number of petit mal seizures Coston reported during the record was two to three per month in late 2012. (Tr. 487). While he experienced two "back to back" petit mal seizures during June 2014 (Tr. 506-07), this number of incidents likewise does not rise to the level required to meet the requirements of the PMPV. At no point in the record did Coston experience more than one petit mal seizure per week, thus he cannot meet the PMPV.

### c.    Waiver

While Coston does not meet either Listing 11.02 or 11.03 (*i.e.* the GMPV or PMPV), the ALJ was nevertheless obligated to craft a RFC assessment which adequately accounted for all of Coston's supportable limitations, including those imposed by his seizures. However, Coston has opted not to argue that the ALJ's RFC was deficient in any way, and instead limited himself to arguing that the ALJ erroneously evaluated the listings. Consequently, any other argument which Coston could have theoretically raised has been waived. "It is well-established that 'issues adverted to in a perfunctory manner,

30

unaccompanied by some effort at developed argumentation, are deemed waived.'" *Rice v. Comm'r of Soc. Sec.*, 169 F. App'x 452, 454 (6th Cir. 2006) (quoting *United States v. Layne*, 192 F.3d 556, 566 (6th Cir. 1999)).

In sum, Coston's sole assertion of error, that the ALJ improperly applied Listings 11.02 and 11.03, fails because Coston did not experience either grand mal or petit mal seizures on a sufficiently frequent basis. Coston has not made any other argument, and whatever arguments he could have developed are therefore waived. The ALJ's decision is supported by substantial evidence, and should be affirmed.

### H.   Conclusion

For the reasons stated above, the Court **RECOMMENDS** that Coston's Motion for Summary Judgment (Doc. 14) be **DENIED**, the Commissioner's Motion (Doc. 16) be **GRANTED**, and that this case be **AFFIRMED**.

## III.   <u>REVIEW</u>

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2). *See also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed.2d 435 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505

(6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Coston v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date:  January 20, 2017                         S/ PATRICIA T. MORRIS
                                                Patricia T. Morris
                                                United States Magistrate Judge

## CERTIFICATION

I hereby certify that the foregoing document was electronically filed this date through the Court's CM/ECF system which delivers a copy to all counsel of record.

Date: January 20, 2017                          By s/Kristen Castaneda
                                                Case Manager

33